# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.                                              **No. CR 18-2850 JAP**

JESUS SAMANIEGO-VILLA, CHRISTIAN
HUMBERTO MEZA-SAMANIEGO, and
DANIEL LANDEROS-GARCIA,

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

Defendants Jesus Samaniego-Villa, Christian Meza-Samaniego, and Daniel Landeros-Garcia are charged in a three-count Indictment (Doc. 23) based on evidence obtained as a result of the August 9, 2018 stop and subsequent search of the vehicle in which Defendants were traveling. On October 26, 2018, Defendants Samaniego-Villa and Landeros-Garcia filed separate motions to suppress the physical evidence and statements that support the charges.[1] Defendant Meza-Samaniego has joined in Defendant Samaniego-Villa's motion.[2] The United States filed a single response in opposition to both motions.[3] Defendant Landeros-Garcia then filed a reply,[4] in

---

[1] *See* MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE BY DEFENDANT JESUS SAMANIEGO-VILLA (Doc. 44) (Samaniego Motion); DEFENDANT DANIEL LANDEROS'S MOTION TO SUPRESS EVIDENCE DERIVED AS A RESULT OF AN INVALID SEARCH AND SEIZURE AND MEMORANDUM IN SUPPORT THEREOF (Doc. 45) (Landeros Motion).

[2] *See* ORDER GRANTING MOTION FOR JOINDER [sic] JESUS SAMANIEGO-VILLA'S MOTION TO SUPPRESS (Doc. 48).

[3] *See* UNITED STATES' RESPONSE TO DEFENDANTS JESUS SAMANIEGO-VILLA's AND CHRISTIAN MEZA-SAMANIEGO'S MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE (DOC. 44) AND TO DEFENDANT DANIEL LANDEROS-GARCIA'S MOTION TO SUPPRESS EVIDENCE DERIVED AS A RESULT OF AN INVALID SEARCH AND SEIZURE AND MEMORANDUM IN SUPPORT THEREOF (DOC. 45) (Doc. 61).

[4] *See* DEFENDANT DANIEL LANDEROS-GARCIA'S REPLY TO THE GOVERNMENT'S RESPONSE TO ALL DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE (Doc. 68).

which Defendant Samaniego-Villa and Defendant Meza-Samaniego have joined with the Court's permission,[5] so that the motions are fully briefed.

The Court heard evidence and argument from counsel at a hearing that began on December 21, 2018, continued on January 10, 2019, and concluded on January 31, 2019. Assistant United States Attorneys Shana Long, Mark Pfizenmayer, and Peter Eicker appeared on behalf of the United States. Defendant Landeros-Garcia was represented by attorney Erlinda Johnson, Defendant Samaniego-Villa was represented by attorney Joseph Sullivan, and Defendant Meza-Samaniego was represented by attorney Santiago Juarez. All three Defendants were present in the courtroom during the three-day hearing, and Defendants Samaniego-Villa and Meza-Samaniego were assisted by court interpreters. At the close of the hearing, the Court allowed the parties to submit additional briefing on Defendants' standing to challenge the search, and the Court specifically requested that the parties address the possession of a vehicle by an unlicensed driver.[6] Having considered the parties' briefs, arguments, evidence, and relevant case law, the Court will deny Defendants' Motions.

## I.      BACKGROUND

At the hearing, the parties presented witnesses and exhibits. The United States offered testimony from Emergency Operations Coordinator Stacy Lewis, of the Bernalillo County Emergency Communications Department, Bernalillo County Sheriff's Office (BCSO) Deputy

---

[5] *See* ORDER (Doc. 70); ORDER GRANTING MOTION FOR JOINDER DANIEL LANDEROS-GARCIA'S REPLY TO MOTION TO SUPPRESS (Doc. 73).
[6] SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION TO SUPPRESS BY DEFENDANT CHRISTIAN MEZA-SAMANIEGO (Doc. 90); SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION TO SUPPRESS BY DEFENDANT JESUS SAMANIEGO-VILLA (Doc. 91); UNITED STATES' SUPPLEMENTAL BRIEFING REGARDING THE DEFENDANTS' MOTIONS TO SUPPRESS (Doc. 92); DEFENDANT DANIEL LANDEROS-GARCIA'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 93).

Anthony McLeod, BCSO Deputy Mitchell Skroch,[7] and BCSO Deputy Ryan Stoffel. Defense witnesses included Paula Sanchez-Knudsen, a private investigator, and Defendant Landeros-Garcia. The Court found the testimony of Ms. Sanchez-Knudsen, Ms. Lewis, and the three deputies to be credible. However, the Court did not find Defendant Landeros-Garcia's testimony was credible. Based on the evidence presented, the Court makes the following findings of fact under Federal Rule of Criminal Procedure 12(d).

On August 9, 2018, at approximately 10:20 p.m., Deputy McLeod and BCSO Deputy Tyler LaPierre responded to the report of a felony domestic violence assault. (Tr. 53:1-19; 64:6-9). The deputies interviewed the victim, who had traveled to another location after the assault. (Tr. 53:22-54:2). The victim used the GPS on Deputy McLeod's cell phone to show the deputies where the assault had occurred. (Tr. 53:22-24). Because she did not know the address, the domestic violence victim zoomed in on a map shown on the cell phone and created a pin drop to mark the house. (Gov't Ex. 1; Tr. 54:3-20). Deputy McLeod took a screenshot of the map with the pin drop to save an image of the location. (Tr. 54:21-23).

When the interview was complete, the deputies called for assistance in attempting to locate the domestic violence offender. (Tr. 54:24-55:3). Deputy McLeod and Deputy LaPierre, who were in a single vehicle, planned to drive to the area near the marked residence, park down the street, and approach the house on foot so that they would be able to surprise the offender if he was there. (Tr. 53:10-14; 56:17-21). While they were on their way to the location, at approximately 11:15 p.m., Deputy McLeod called Deputy Skroch. (Tr. 65:18-66:6; 115:23-24;

---

[7] On the second day of the suppression hearing, at the beginning of Deputy Skroch's cross-examination, counsel for Defendant Landeros-Garcia moved to strike Deputy Skroch's testimony because representatives of the United States had met with Deputy Skroch over the recess and had provided him with a transcript of his direct testimony from the first day of hearing. (Tr. 171:2-15). At the Court's direction, the United States submitted copies of all communications between Deputy Skroch and representatives of the United States during the recess. Based on this evidence, the Court concludes that no improper coaching occurred, and it will deny the oral motion to strike Deputy Skroch's testimony.

118:2-5). Deputy Skroch told Deputy McLeod he would meet them near the house and approach the residence with them on foot. (Tr. 55:4-6). At 11:19 p.m. Deputy McLeod sent Deputy Skroch the map with the pin drop showing the location. (Tr. 62:18-19; 69:2-9, 115:24-116:1; 118:2-5). The house was on Foothill, a street in Albuquerque's South Valley neighborhood, which is generally a high crime area. (Tr. 115:5-11).

When Deputy McLeod and Deputy LaPierre arrived, Deputy Skroch was waiting on Foothill to the south of the residence. (Tr. 58:7-9; 118:17-18; 119:14-18). Deputy McLeod and Deputy LaPierre approached on Foothill from the north and had planned to park north of the house. (Tr. 59:6-9). However, Deputy LaPierre was unfamiliar with the area and accidentally drove past the house instead. (Tr. 56:22-23; 58:15-17). Deputy LaPierre and Deputy McLeod made contact with Deputy Skroch on the south side of the house and told him the name of the offender and the allegations. (Tr. 56:23-25; 59:14-16; 207:19-21). Deputy LaPierre then turned around and drove north on Foothill past the residence again. (Tr. 57:1-2; 59:18-60:4). As the deputies were driving past the house for the second time, they observed some individuals outside the house getting into a dark-colored truck. (Tr. 60:4-8). The truck exited the driveway beside the house and drove south on Foothill as the deputies were approaching the house on foot. (Tr. 60:8-9; 61:6-7; 119:24-120:11). Deputy McLeod and Deputy Skroch believed that the domestic violence offender might be in the dark-colored truck, and they decided that Deputy Skroch should pull the truck over to investigate. (Tr. 61:10-13; 92:5-20, 99:23-100:5; 121:2-7; 286:12-18; 287:4-8).

Deputy Skroch got back in his patrol car, turned it around, and drove south on Foothill to follow the truck. (Tr. 61:14-16; 121:16-17). He located the truck stopped at a traffic light on Arenal Rd. at its intersection with Coors Blvd. (Tr. 121:18-22). The truck was on the east side of

the intersection headed westbound across Coors. (Tr. 121:18-22). There are three lanes on the east side of the intersection, one that turns left to go southbound on Coors, one that turns right to go northbound on Coors, and one that goes straight, to stay westbound on Arenal. (Tr. 122:22-123:3). The truck was in the middle lane, headed straight across the intersection westbound on Arenal. (Tr. 123:4-5). Deputy Skroch pulled up behind the truck at the red light and ran the truck's license plate information. (Tr. 124:22-125:2; 287:16-20). In response, he received registration information and learned that the truck was registered to a middle-aged female. (Tr. 125:6-13). When the light turned green, the truck crossed the intersection and continued driving west on Arenal. (Tr. 123:6-8). Arenal has two westbound lanes on the west side of the intersection with Coors. (Tr. 123:10-12). The truck was traveling in the righthand lane. (Tr. 123:17-23). Right after the truck crossed Coors, Deputy Skroch observed the truck's passenger-side tires cross the solid line into the bike lane on Arenal. (Tr. 123:7-9).

At that point, at approximately 11:26 p.m., Deputy Skroch notified dispatch that he was going to conduct a traffic stop. (Tr. 124:5-8). He engaged his overhead emergency lights, but the truck did not stop immediately. (Tr. 124:22-125:2; 125:17-18; 289:3-21). Instead, it maintained its speed and continued to travel west on Arenal in the right lane. (Tr. 125:20-21). The truck drove past multiple locations where it could have pulled over. (Tr. 125:22-126:8). Finally, it turned right onto Don Aragon and slowly rolled to a stop. (Tr. 126:11-23). It took much longer for the truck to stop than Deputy Skroch would generally expect of a vehicle operated by a law-abiding driver. (Tr. 331:9-14; 334:24-335:5). By radio, Deputy Skroch again asked Deputy McLeod and Deputy LaPierre for the name of the domestic violence offender, but he did not hear the response from dispatch. (Gov't Ex. 10 at 2; Def. Ex. HH at 2; Tr. 146:9-16; 220:2-9).

The truck had dark tinted windows, so that Deputy Skroch was unable to see into the vehicle as it was stopping. (Tr. 127:4-22). After the truck had stopped, Deputy Skroch got out of his patrol car and yelled at the occupants to turn off the engine and roll down the windows. (Tr. 127:24-25). When he did not receive any response, Deputy Skroch repeated the instructions over his PA system and the driver then turned off the truck's engine. (Tr. 128:2-5). Deputy Skroch approached the truck on its passenger side, where the window was rolled down about half-way. (Tr. 128:7-10). When he reached the B pillar of the truck, just behind the front passenger window,[8] Deputy Skroch saw that the driver was wearing a multicam plate carrier. (Tr. 130:17-18; 218:3-8). The vest appeared to have front, back, and side body armor plates in it, as well as a 30-round AR-15 magazine. (Tr. 130:18-19). The driver's belt also had a number of hand gun magazines on it, along with an empty holster. (Tr. 130:19-21). In addition, Deputy Skroch observed cash spread across the dashboard, the glovebox area, and the center console. (Gov't Ex. 5; Tr. 139:5-10). There was a skull-shaped object on the dash, along with a rosary and a figure Deputy Skroch recognized as Santa Muerte, which he knew from his training and experience was associated with drug trafficking. (Gov't Ex. 6; Tr. 139:10-14). Above the glovebox, there was a compartment containing what Deputy Skroch believed were two flash-bang explosive devices. (Gov't Ex. 18; Tr. 140:9-141:2). Deputy Skroch was extremely concerned by what he saw, and he believed the truck's occupants were probably armed. (Tr. 153:13-154:17).

Deputy Skroch addressed the driver, later identified as Defendant Samaniego-Villa, but then also began speaking with the front-seat passenger, later identified as Defendant Landeros-Garcia, because Defendant Samaniego-Villa did not speak English. (Tr. 128:12-16; 130:4-12). Deputy Skroch asked Defendant Samaniego-Villa in Spanish if he had a driver's license and

---

[8] The truck was a GMC Sierra Denali with an extended crew cab, so that it had both front and back passenger seats. *See* Doc. 92-1 at 23.

Defendant Samaniego-Villa responded that he did not. (Gov't Ex. 10 at 3; Tr. 148:15-16). Deputy Skroch then asked Defendant Landeros-Garcia for his identification. (Gov't Ex. 10 at 3-4). Defendant Landeros-Garcia gave Deputy Skroch his driver's license, which Deputy Skroch retained for the duration of the stop. (Tr. 132:1-7; 222:16-223:3). Deputy Skroch inquired as to why Defendant Samaniego-Villa was wearing body armor, but he did not receive a response. (Tr. 131:2-5). Deputy Skroch did not mention seeing the truck at the suspected domestic violence offender's residence, nor did he inquire about the alleged offender. (Tr. 219:15-220:16). At that point, about 11:28 p.m., Deputy Stoffel arrived to assist Deputy Skroch, and Deputy Skroch instructed Deputy Stoffel to remove Defendant Samaniego-Villa from the truck. (Tr. 131:14-16; 350:22-24).

Believing Defendant Samaniego-Villa was probably armed, Deputy Skroch asked Defendant Samaniego-Villa in Spanish whether he had a firearm. (Gov. Ex. 10 at 4-5; Tr. 131:7-10). He understood Defendant Samaniego-Villa's response to indicate that he was armed, and that the gun was on his back. (Tr. 131:11-12). Deputy Skroch could also see some rifle barrels sticking up in the back of the truck. (Tr. 148:8-11). Deputy Skroch instructed Deputy Stoffel to place Defendant Samaniego-Villa in handcuffs because he appeared to be armed. (Gov't Ex. 10 at 4-6; Tr. 131:14-16; 350:22-24). Deputy Stoffel did so, while Deputy Skroch asked Defendant Landeros-Garcia to step out of the truck. (Tr. 131:17-21). When Defendant Landeros-Garcia exited the vehicle, Deputy Skroch noticed that he also was wearing a base plate for a holster or magazines. (Tr. 131:21-23). Deputy Skroch patted Defendant Landeros-Garcia down for weapons, but he found only a handgun magazine. (Gov't Ex. 10 at 7; Tr. 131:23-24; 132:8-12). Deputy Skroch then instructed Defendant Landeros-Garcia to sit on the front bumper of his

patrol car. (Tr. 132:8-14). Defendant Landeros-Garcia was detained but he was not handcuffed. (Tr. 133:4-6; 224:4-6).

Deputy Stoffel brought Defendant Samaniego-Villa back to where Deputy Skroch was standing. (Tr. 386:4-15). Deputy Skroch called for a Spanish-speaking deputy to assist with interpretation, but also attempted to question Defendant Samaniego-Villa and Defendant Landeros-Garcia about the weapons in the meantime. (Tr. 133:13-18). Deputy Skroch asked Defendant Samaniego-Villa for identification, and Defendant Samaniego-Villa gave Deputy Skroch a Mexican voter ID. (Tr. 148:12-14). Deputy Skroch then asked the Defendants why they had money, guns, and body armor, and how they had purchased the firearms. (Tr. 148:22-25; 319:11-13). Deputy Skroch called Deputy McLeod and Deputy LaPierre to tell them that he did not think any of the Defendants was the domestic violence offender. (Gov't Ex. 10 at 12; Tr. 149:14-16).

Deputy Stoffel returned to the truck and asked Defendant Meza-Samaniego, who was the rear-seat passenger, to step out as well. (Tr. 132:15-23; 351:20-352:9; 388:4-389:3). Deputy Stoffel observed numerous firearms stacked in a pile on the driver's side and middle of the rear seat. (Tr. 352:12-14). He also saw a pistol in the pocket on the back of the front passenger seat, directly in front of the rear-seat passenger. (Tr. 352:14-15; 352:20-22). The pistol appeared to be loaded because the slide was forward and there was a magazine inside. (Tr. 352:14-19). Deputy Skroch approached Deputy Stoffel and also saw a large pile of firearms in the back seat of the truck next to Defendant Meza-Samaniego. (Tr. 132:23-133:2). The guns were randomly stacked on top of each other. (Tr. 132:25-133:1).

Deputy Stoffel believed that the weapons were not in a safe condition because the magazines and barrels were pressed against trigger guards. (Tr. 353:16-18). The barrels were

facing different directions, and Deputy Stoffel thought that it would be possible for the barrel of one gun to enter the trigger guard of another and cause it to fire if it were loaded. (Tr. 354:6-17). A magazine could also cause a gun to fire if its corner pressed against the trigger. (Tr. 354:16-17). Deputy Stoffel did not know the condition of the firearms, whether they operated properly, or whether they were loaded. (Tr. 353:18-24). However, in his experience the South Valley was a high-crime area and firearms found there were frequently not safe. (Tr. 353:20-24; 354:21-24).

Defendant Meza-Samaniego exited the vehicle and Deputy Stoffel placed him with Deputy Skroch behind the truck. (Tr. 133:9-11). He was not handcuffed. (Tr. 133:7-8; 319:24-25). Defendant Landeros-Garcia told Deputy Skroch that the other occupants of the vehicle were not United States citizens. (Gov't Ex. 11 at 5; Tr. 317:21-319:1; 388:21-389:3; 395:15-20). Deputy Skroch asked why Defendants had guns and how they had purchased the weapons if the other two Defendants were not United States citizens. (Tr: 318:22-319:1, and Defendant Landeros-Garcia stated that they had obtained the weapons at a gun show. (Gov't Ex. 11 at 6). Defendant Meza-Samaniego did not have identification, but he wrote down his name and birth date for Deputy Skroch. (Tr. 153:4-6). Deputy Skroch asked Defendant Meza-Samaniego whether he was a United States citizen because Defendant Samaniego-Villa had provided a Mexican voter ID as identification and Deputy Skroch was unable to look up forms of identification other than a United States driver's license. (Gov't Ex. 11 at 7; Tr. 319:19-22).

At approximately 11:46 p.m. Deputy Valente Marquez arrived to interpret for Deputy Skroch. (Tr. 134:4-12; 154:23-25). Deputy Skroch then began questioning Defendant Samaniego-Villa with help from Deputy Marquez. (Tr. 134:13-19). Defendant Samaniego-Villa was not advised of his Miranda rights. (Tr. 267:19 053 , and Deputy Skroch asked Defendant Samaniego-Villa if the truck was his and Defendant Samaniego-Villa replied that it was not.

(Gov't Ex. 10 at 18; Tr. 267:6-8; 303:4-6). Defendant Samaniego-Villa told Deputy Skroch that the truck belonged to Defendant Landeros-Garcia's mother. (Gov't Ex. 10 at 18; Tr. 135:3-6, 267:12-15; 314:7-10). Defendant Samaniego-Villa claimed responsibility for three of the firearms in the truck. (Gov't Ex. 10 at 20). Deputy Skroch then asked if there were any illegal drugs in the vehicle. (Gov't Ex. 10 at 21; Tr. 135:22-24). Defendant Samaniego-Villa said that there were not, but after noting that Defendant Samaniego-Villa smelled like methamphetamine, Deputy Skroch and Deputy Marquez questioned Defendant Samaniego-Villa more specifically by naming different types of narcotics. (Gov't Ex. 10 at 21-22). Defendant Samaniego-Villa then told Deputy Skroch that there was a small bag of cocaine in the truck. (Gov't Ex. 10 at 22; Tr. 135:25-136:5).

At that point, Deputy Skroch asked Defendant Samaniego-Villa for his consent to search the truck. (Gov't Ex. 10 at 23; Tr. 134:20-22). Defendant Samaniego-Villa replied that the truck did not belong to him so he did not think he should give consent for it to be searched. (Gov't Ex. 10 at 23; Tr. 267:6-8; 303:4-6). Defendant Samaniego-Villa then referred to the truck as belonging to Defendant Landeros-Garcia, and said he wanted to talk to Defendant Landeros-Garcia before agreeing to a search. (Gov't Ex. 10 at 23; Tr. 135:3-6, 267:12-15; 314:7-10). Defendant Landeros-Garcia's mother, Maria de Jesus Garcia de Landeros, is the registered owner of the truck.[9] (Gov't Ex. 24; Doc. 92-1). The truck's chain of title reflects that Ms. Garcia de Landeros purchased the truck on June 18, 2018 for $8,500 from the former title holder and registered owner, Mr. Noel Amaya. Gov't Ex. 24. However, the New Mexico Motor Vehicle Department paperwork shows a sale price of $36,240 on Ms. Garcia de Landeros' June 27, 2018

---

[9] In support of UNITED STATES' SUPPLEMENTAL BRIEFING REGARDING THE DEFENDANTS' MOTIONS TO SUPPRESS (Doc. 92), the government submitted Motor Vehicle Department documents pertaining to the truck in which Defendants were stopped. *See* Doc. 92-1. The Court will take judicial notice of these documents, including the title and registration history of the truck.

Application for Vehicle Title and Registration. Doc. 92-1. Mr. Amaya had purchased the truck new from a dealership for approximately $68,000 one year earlier, in June 2017. Doc. 92-1. Defendant Samaniego-Villa was not the registered owner of the truck and his name does not appear anywhere in the truck's documentation of title or of registration. Gov't Ex. 24; Doc. 92-1.

Deputy Skroch was aware that none of the truck's occupants was the registered owner of the vehicle since the plate information had shown that person to be a middle-aged female. (Tr. 135:7-15; 329:25-330:11). Deputy Skroch did not ask Defendant Landeros-Garcia for consent to search. (Tr. 135:18-19). The deputies informed Defendant Samaniego-Villa that he could consent to the search because he had been driving the truck. (Gov't Ex. 10 at 24; Tr. 269:19-270:3). Defendant Samaniego-Villa then agreed that Deputy Skroch could search the vehicle, and Deputy Skroch questioned him about the specific location of the cocaine. (Gov't Ex. 10 at 24-25; Tr. 134:20-135:2; 270:4-10). Defendant Samaniego-Villa told Deputy Skroch the cocaine was in the center console. (Gov't Ex. 10 at 25).

Deputy Skroch patted Defendant Samaniego-Villa down for weapons and removed the handcuffs from Defendant Samaniego-Villa when he did not find any. (Gov't Ex. 10 at 26-27; Tr. 155:14-156:5). Deputy Skroch then presented Defendant Samaniego-Villa with a written consent form to authorize the search, but Defendant Samaniego-Villa said that he needed to ask Defendant Landeros-Garcia's permission first and refused to sign it. (Gov't Ex. 10 at 28-30; Tr. 134:20-135:2; 270:4-10). However, Defendant Samaniego-Villa gave his consent for Deputy Skroch to retrieve the cocaine and told Deputy Skroch that the cocaine belonged to him. (Gov't Ex. 10 at 31-32; Tr. 135:25-136:7). Deputy Skroch found a small bag of cocaine in the vehicle and removed it. (Tr. 136:6-7). Deputy Skroch then placed Defendant Samaniego-Villa back in

handcuffs and under arrest for possession of a controlled substance. (Gov't Ex. 10 at 32-33; Tr. 136:8-10).

Meanwhile, after removing Defendant Meza-Samaniego from the back seat, Deputy Stoffel had returned to the truck to render the pile of firearms safe. (Tr. 136:13-16; 355:5-12). Deputy Stoffel did not have a search warrant or consent to search the truck, but he believed that the firearms posed a potential danger. (Tr. 370:13-25; 372:6-15; 377:6-378:4). Deputy Stoffel removed the magazines, checked the guns to be sure there were no rounds in any of the chambers, and cleared one that was "stove-piped," where a round was jammed halfway into the chamber and could have discharged. (Tr. 355:12-22; 356:10-16). While Deputy Stoffel was clearing the firearms, he noticed that one of them had the capability of being a fully automatic weapon, the legal ownership of which required a specific license. (Tr. 357:19-24; 376:10-24; 358:11-12). In addition to his impression that the automatic weapon was probably illegal, Deputy Stoffel had overheard Defendant Landeros-Garcia tell Deputy Skroch that the other Defendants were not United States citizens, and Deputy Stoffel believed that they were therefore not permitted to own firearms. (Gov. Ex. 11 at 5-6; Tr. 356:20-24; 357:6-18; 388:21-389:3; 395:15-20). Deputy Stoffel did not remove the firearms from the vehicle as he checked them to ensure their safety, but, due to his suspicions that Defendants had not acquired the firearms legally, he did record the serial numbers of the weapons. (Gov. Ex. 11 at 5-6; Tr. 356:20-24; 357:6-18; 388:21-389:3; 395:15-20).

At approximately 11:46 p.m., after Deputy Stoffel had finished making sure that the guns were unloaded, he began running the serial numbers to determine whether any of the firearms had been stolen. (Tr. 358:18-22; 359:11-16; 361:2-11). Two of the firearms returned as stolen, which Deputy Stoffel confirmed at approximately 11:51 p.m. through the National Crime

Information Center (NCIC). (Tr. 359:16-17; 362:5-20). Deputy Stoffel then informed Deputy

Skroch that two of the guns had been stolen. (Tr. 362:21-22). Deputy Skroch learned of the

stolen firearms right after he had removed the cocaine from the truck and placed Defendant

Samaniego-Villa under arrest. (Tr. 136:17-22; 158:4-10). At that point, Deputy Skroch placed all

three Defendants under arrest for possession of stolen firearms. (Tr. 136:24-25). The deputies

then inventoried the truck prior to having it towed, as is required by BCSO standard operating

procedures, because the registered owner was not present. (Tr. 138:3-9; 342:12-343:11). During

the inventory, they found multiple handguns and rifles, a few small bags with cocaine and

cocaine residue, and over $33,000 in cash, some of which was out in plain sight and some of

which was in a bag sticking out from inside the rear wall of the vehicle's cab. (Gov't Ex. 7-9; Tr.

138:16-139:10; 141:15-25). However, the inventory sheet did not document all objects of value

that were in the truck. (Tr. 280:12-281:24).

## II.     LEGAL STANDARD

"The right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Suppression

of evidence is an appropriate remedy only when the search [or seizure] violates a person's

constitutional rights." *United States v. Gama-Bastidas*, 142 F.3d 1233, 1238 (10th Cir. 1998).

"The proponent of a motion to suppress has the burden of adducing facts at the suppression

hearing indicating that his own rights were violated by the challenged search." *Id.* (internal

quotation marks and citation omitted).

## III.    DISCUSSION

Defendants ask the Court to suppress the evidence seized and statements made during the

August 9, 2018 traffic stop. They contend that their Fourth Amendment rights were violated

because the initial stop was not supported by reasonable suspicion, they were unlawfully detained, and the warrantless search of the truck was unlawful. Additionally, Defendant Samaniego-Villa asserts that his Fifth Amendment rights were violated because he was questioned without prior *Miranda* warnings.

### A. Standing

"'Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises.'" *United States v. Mosley*, 743 F.3d 1317, 1322 (10th Cir. 2014) (quoting *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001)). "The proper inquiry is whether a challenged stop and search violated the Fourth Amendment rights of a criminal defendant making the challenge." *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989). A traffic stop is a seizure of the vehicle's occupants, and any occupant may challenge the reasonableness of the initial stop and his or her own detention under the Fourth Amendment. *See id.*

However, to establish standing to challenge the search of the truck, Defendants bear the burden of showing a "legitimate possessory interest in or lawful control over the car." *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003). When the proponent of a motion to suppress is not the registered owner of the vehicle, the evidence must establish "that he gained possession from the owner or someone with authority to grant possession." *Id.* (internal quotation marks omitted). "[M]ere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *Id.* "[H]owever, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." *Id.* Instead, credible testimony showing that the defendant had permission to use the vehicle from

the owner or from someone he reasonably believed had lawful possession and authority to loan the vehicle is sufficient to establish standing. *Id.* "[W]ithout a possessory or property interest in the vehicle searched, passengers lack standing to challenge vehicle searches." *Mosley*, 743 F.3d at 1322 (internal quotation marks omitted).

## 1. Defendant Meza-Samaniego

The Court concludes that Defendant Meza-Samaniego lacks standing to challenge the search. He was a rear-seat passenger, he has made no claims of any proprietary or possessory interest in the vehicle, he did not assert ownership of anything seized from the vehicle, and he has made no argument and presented no evidence in support of his own standing. The only evidence offered to support his standing was Defendant Landeros-Garcia's testimony that all the Defendants had permission to use the vehicle. The Court did not find Defendant Landeros-Garcia's testimony credible. Additionally, the fact that a passenger is permitted to ride in a vehicle is insufficient to establish a legitimate expectation of privacy. *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995).

## 2. Defendant Landeros-Garcia

Defendant Landeros-Garcia was also a passenger, and he has not asserted ownership of the truck. Although Defendant Landeros-Garcia testified that he had permission from his mother to use the truck, (Tr. 411:24-412:7), his mother's ownership is questionable due to the circumstances surrounding transfer of title. At the suppression hearing, Defendant Landeros-Garcia testified that the truck belonged to Defendant Samaniego-Villa. (Tr. 409:25-410:1). Defendant Landeros-Garcia stated that his mother registered the truck in her name in June 2018 only because Defendant Landeros-Garcia asked her to do so as a favor to Defendant Samaniego-Villa, who owned the truck but had asked Defendant Landeros-Garcia to register it. (Tr. 410:2-

12). Defendant Landeros-Garcia denied having asked his mother to purchase the truck, and said he only asked her to put it in her name as a favor. (Tr. 418:12-17).

Defendant Landeros-Garcia stated that Defendant Samaniego-Villa brought the truck's certificate of title to him for his mother to sign, and that they did not speak to anyone other than Defendant Samaniego-Villa about the truck. (Tr. 418:20-419:13). Defendant Landeros-Garcia attested that he believed Defendant Samaniego-Villa owned the truck because he was driving it, but he had never seen any proof that Defendant Samaniego-Villa was the owner. (Tr. 420:17-421:7). Defendant Landeros-Garcia testified that he did not know Mr. Noel Amaya, that he was not with his mother when she completed the truck's registration paperwork, and that he did not know whether she had paid Mr. Amaya any money for the truck. (Tr. 414:10-11; 418:2-4; 418:20-419:5). Defendant Landeros-Garcia stated that neither he nor his mother was paid to register the truck. (Tr. 410:21-24).

Defendant Landeros-Garcia testified further that he had driven the truck on one occasion with the permission of Defendant Samaniego-Villa, and he had a set of keys to the truck at the time Defendants were stopped by Deputy Skroch. (Tr. 411:9-23). However, Defendant Samaniego-Villa was not the registered owner of the truck and his name does not appear anywhere in the truck's documentation. Gov't Ex. 24; Doc. 92-1. At the scene of the traffic stop, Defendant Samaniego-Villa denied owning the truck. (Tr. 267:6-8; 303:4-6).

The Court concludes that ownership of the truck is unclear. Although Defendant Landeros-Garcia claims permission from the registered owner, his own testimony calls the legitimacy of that ownership into question. Instead, Defendant Landeros-Garcia testified that Defendant Samaniego-Villa in fact owned the truck, but there is no other evidence in support of this statement. Further, Defendant Landeros-Garcia was not in control of the truck at the time of

the stop. Although he stated that he had previously driven the truck and had his own set of keys, the Tenth Circuit Court of Appeals has held that prior control and possession of keys do not establish standing. *See Eylicio-Montoya*, 70 F.3d at 1162. Defendant Landeros-Garcia claimed ownership of water jugs and a satchel that were in the truck, and argues that this satchel was seized, but he did not claim ownership of any of the firearms that are the subject of the suppression motions. Ownership of seized goods may be a factor to be considered, but it does not establish a reasonable expectation of privacy in the place searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980). Finally, it is a defendant's burden to establish standing, and the Court did not find Defendant Landeros-Garcia's contradictory testimony to be credible. Accordingly, the Court concludes that Defendant Landeros-Garcia lacks standing to challenge the search.

### 3. Defendant Samaniego-Villa

Defendant Samaniego-Villa has the strongest claim to standing because he was the driver of the vehicle at the time of the stop and, according to Defendant Landeros-Garcia, the truck in fact belongs to Defendant Samaniego-Villa. If Defendant Samaniego-Villa were the truck's owner, he would have standing to challenge the search. However, Defendant Samaniego-Villa's name is not on any of the truck's ownership documents, and he personally disclaimed ownership multiple times when the truck was stopped, telling deputies first that the truck belonged to Defendant Landeros-Garcia's mother and then referring to it as if it belonged to Defendant Landeros-Garcia. Accordingly, the only evidence of his ownership is Defendant Landeros-Garcia's testimony, which the Court did not find credible.

Even without ownership, Defendant Samaniego-Villa could have standing if there is evidence that he was in lawful possession of the vehicle. Defendant Landeros-Garcia testified that Defendant Samaniego-Villa had the permission of the registered owner to drive the truck. If

this were credible testimony it could adequately establish Defendant Samaniego-Villa's standing to challenge the search. However, again, the Court did not find Defendant Landeros-Garcia to be credible, and Defendant Samaniego-Villa did not testify and has not presented any evidence on his own behalf. Even if the Court were to accept Defendant Landeros-Garcia's testimony as evidence that his mother gave Defendant Samaniego-Villa permission to use the truck, Defendant Landeros-Garcia also testified that his mother was not the real owner, but instead was a straw purchaser of the vehicle, who registered the truck only at his request.

Ms. Garcia de Landeros appears to have some claim of legal ownership of the vehicle, since she is listed on the title, registration, and insurance. However, these documents reflect two different purchase prices, with the title showing that she paid $8,500 for the truck and the registration stating that she bought the truck for $36,240. It is unknown whether she in fact paid any money for the truck, or if she obtained it from Noel Amaya, the previous registered owner. There is no evidence Noel Amaya was present at the transaction, since Defendant Landeros-Garcia claimed that he had never met Noel Amaya. Defendant Landeros-Garcia stated that Defendant Samaniego-Villa brought the title to his house, but no evidence establishes how Defendant Samaniego-Villa came to be in possession of the truck or the title. The evidence as a whole suggests that the transaction was a sham, with or without the knowledge of Noel Amaya, and ownership of the truck remains unclear.[10]

The caselaw is sparse on standing based on permission from a sham owner. In *United States v. Okoth*, 170 F.Supp.2d 1140, 1143 (D.Kan. 2001), the Court held that an alleged owner who had paid with a fraudulent check did not possess a legitimate ownership interest and consequently did not have standing to object to a search. Here, there is no evidence that Ms.

---

[10] It might have been helpful if any of the Defendants had subpoenaed Ms. Garcia de Landeros to testify in support of their motions to suppress and to clarify ownership of the truck and permission to drive it.

Garcia de Landeros paid for the truck, and Defendant Landeros-Garcia's testimony suggests to the Court that she probably did not. The same testimony upon which Defendant Samaniego-Villa relies to demonstrate that he had permission to drive the truck also describes Ms. Garcia de Landeros as an illegitimate owner. When a defendant says he obtained a vehicle from someone he knows is not really the owner, he must present evidence that the person who loaned him the car was in lawful possession. *See United States v. Arango*, 912 F.2d 441 (10th Cir. 1990). Defendant Samaniego-Villa would have known that Ms. Garcia de Landeros was a sham owner since he was the one who had asked that Defendant Landeros-Garcia register the truck on his behalf, and Defendant Samaniego-Villa presented no evidence Ms. Garcia de Landeros had lawfully obtained the car. Defendant Samaniego-Villa did claim ownership of three of the guns seized, but that alone is not sufficient to establish his standing. *See Rawlings*, 448 U.S. at 105. Additionally, Defendant Samaniego-Villa did not display a subjective expectation of privacy in the truck when, at the stop, he denied ownership of the truck and stated that Defendant Landeros-Garcia should be the one asked for permission to search.

In arguing for standing, Defendants rely on *United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir. 1993), where the driver claimed to have borrowed the vehicle from his uncle. His uncle's name was on the registration and the car was not stolen. *Id.* The Tenth Circuit Court of Appeals held that "absent evidence that defendant wrongfully possessed the vehicle [this evidence] is sufficient to confer standing on him to challenge the subsequent search of the car." *Id.* Defendants seem to suggest that, because Defendants assert that they had permission to drive the truck, *Soto* shifts the burden to the United States to show that Defendants' possession is wrongful. However, "it is the defendant's burden to establish standing to challenge a fourth amendment violation." *United States v. Dewitt*, 946 F.2d 1497, 1499 (10th Cir. 1991). In *Soto*, it

was uncontested that the driver's uncle was the lawful owner of the car and that the driver had informed law enforcement at the scene of the traffic stop that his uncle had lent him the vehicle. Here, however, Defendants have presented only vague and contradictory evidence as to the truck's ownership or their own lawful possession of the vehicle. The Court finds that Defendants' circumstances are distinguishable from *Soto* and concludes that even Defendant Samaniego-Villa has not met the minimal burden to prove his standing to challenge the search of the truck.

### B.      Lawfulness of Defendants' Detention

"Even where a defendant lacks 'the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle,' however, 'the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the defendant's illegal detention.'" *Mosley*, 743 F.3d at 1322-23 (quoting *DeLuca*, 269 F.3d at 1132). "To suppress evidence as the fruit of his unlawful detention, a defendant must show, first, that he was seized in violation of his Fourth Amendment rights and, second, that a factual nexus exists between his unlawful seizure and detention and the challenged evidence." *Id.* at 1323 (internal quotation marks omitted). "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not fruit of the poisonous tree." *Id.* (internal quotation marks omitted). "In analyzing the constitutionality of a traffic stop under the Fourth Amendment, [the Court applies] the 'reasonable suspicion' standard for investigative detentions originally set forth in *Terry v. Ohio*." *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009).

### 1. Reasonableness of the Initial Stop

Under *Terry*, the Court asks first "whether an officer's stop of a vehicle was justified at its inception." *Id.* (internal quotation marks omitted). "An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013) (quoting *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011)). The Court "evaluate[s] the totality of the circumstances to determine whether 'the detaining officer had a particularized and objective basis for suspecting legal wrongdoing.'" *Id.* (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007)).

These suspicions must be more than a hunch, but the likelihood of criminal activity need not rise to the level of probable cause and may even be less than the prospect of guiltless conduct. *Id.* "Due to their 'experience and specialized training,' [the Court] 'accord[s] deference to an officer's ability to distinguish between innocent and suspicious actions.'" *Id.* (quoting *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003)). The objective standard is based on the facts available to the officer at the moment of the seizure, and the Court will not consider the officer's subjective motivations. *Winder*, 557 F.3d at 1134; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (constitutional reasonableness does not depend on actual motivations of individual officers involved).

Deputy Skroch stopped Defendants' vehicle for two reasons: his belief that the domestic violence offender might be in the truck and his belief that the driver had violated traffic laws by failing to maintain the truck's lane when it crossed Coors Blvd. heading west on Arenal Rd. Defendants argue that no traffic violation occurred or that the violation was minimal, and that the stop was therefore pretextual.

In New Mexico, "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." NMSA 1978, § 66–7–317. Defendants contend that the truck's tire crossing briefly over the solid line into the bike lane a single time is insufficient to create reasonable suspicion that the traffic laws have been violated. *See United States v. Harmon*, 742 F.3d 451, 456–57 (10th Cir. 2014). However, the Court has previously interpreted "Section 66-7-317 to prohibit a driver from driving on the lane markers that divide a lane from the shoulder" after noting that "the Tenth Circuit [Court of Appeals] has consistently upheld stops of drivers who have minimally crossed a lane marker." *United States v. Bassols*, 775 F.Supp.2d 1293, 1300-01 (D.N.M. 2011). "It is irrelevant, for purposes of Fourth Amendment review, whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Further, even if Deputy Skroch had misinterpreted the scope of the traffic statute, a reasonable mistake of law can support reasonable suspicion. *See Heien v. North Carolina*, ___ U.S. ___, 135 S.Ct. 530, 536 (2014) ("The question here is whether reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition. We hold that it can.").

Additionally, a valid traffic stop need not be based on a traffic or equipment violation but can be premised on any particularized and objective basis for reasonable suspicion that criminal activity is, has, or is about to occur. *See United States v. Whitley*, 680 F.3d 1227, 1232-33 (10th Cir. 2012). The truck's failure to maintain its lane was not the only objective basis for suspecting criminal activity. The deputies had observed the truck leaving a lot they believed to be associated with the domestic violence incident, after Deputy McLeod and Deputy LaPierre drove back and

forth in front of the house in a marked patrol car. They thought that the perpetrator might be in the vehicle and determined that Deputy Skroch should stop the truck to investigate. "Law enforcement officers may 'conduct an investigatory stop if they have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with' a crime in progress, a completed felony, or perhaps, a completed misdemeanor." *Poolaw v. Marcantel*, 565 F.3d 721, 736 (10th Cir. 2009) (quoting *United States v. Moran*, 503 F.3d 1135, 1141-43 (10th Cir. 2007)). Additionally, "[b]oth [the Tenth Circuit Court of Appeals] and the Supreme Court have held that a suspect's unprovoked flight and other evasive behavior upon noticing police officers is a pertinent factor in determining reasonable suspicion." *Madrid*, 713 F.3d at 1257. Even if Defendants were not associated with the residence of the suspected domestic violence offender, the deputies' belief that the offender might be in the truck was reasonable after they observed it pull out of the adjacent driveway after the marked police car had twice driven past the residence. "'[R]easonable suspicion may be supported by an objectively reasonable good faith belief even if premised on factual error.'" *Id.* at 1256 (quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004). The Court concludes that, under the totality of the circumstances, the initial stop of Defendants' vehicle was supported by reasonable suspicion.

### 2.      Reasonableness of Defendants' Continued Detention

"A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the circumstances that initially justified it." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017). "A stop may, however, be extended beyond that scope if the person stopped consents to the extension or if the police have a reasonable suspicion that other illegal activity has occurred or is occurring." *Id.* As with the

justification for the initial stop, the government bears the burden to prove that any continued non-consensual detention was supported by particular objective facts from the totality of which it is reasonable for a trained officer to believe crime is indicated. *See id.* "[R]easonable suspicion can be founded on a combination of factors that individually may be susceptible of innocent explanation." *Id.*

Defendants argue that Deputy Skroch was not really investigating the alleged traffic violation or domestic violence because he did not issue a traffic citation or question Defendants about the domestic violence incident. The Court disagrees. Deputy Skroch testified that he quickly expanded the scope of his investigation shortly after he encountered Defendants, but when Deputy Skroch first stopped the truck he asked Deputy McLeod and Deputy LaPierre by radio for the name of the domestic violence perpetrator, and he informed Defendants that they had committed a traffic violation. "It is well-established that a law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (internal brackets and quotation marks omitted). During this process, officers may take steps that are reasonably necessary to protect their personal safety. *United States v. Windom*, 863 F.3d 1322, 1329 (10th Cir. 2017).

As Deputy Skroch approached the truck, he observed that Defendant Samaniego-Villa was wearing body armor, a holster, and a magazine, and that the truck contained two flash-bang explosive devices. Deputy Skroch asked whether Defendant Samaniego-Villa was armed, and reasonably understood the response to indicate that he was. "[W]hen an officer has a reasonable belief that a suspect he is investigating at close range is armed, 'it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the

person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *see also United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) ("The Fourth Amendment does not require that officers unnecessarily risk their lives when encountering a suspect whom they reasonably believe to be armed and dangerous."). "[T]he governmental interest in the safety of police officers outweighs the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous." *United States v. King*, 990 F.2d 1552, 1561 (10th Cir. 1993).

Defendants argue that their possession of firearms and body armor does not support reasonable suspicion of criminal activity because it is legal in New Mexico. *See Poolaw*, 565 F.3d at 736 ("Because it is lawful to carry a gun in a vehicle in New Mexico . . . [a vehicle occupant's] admission that she had a gun does not weigh heavily in our reasonable suspicion calculus—particularly in light of the fact that Marcantel knew the Poolaws legally owned firearms." (internal citations omitted)). However, when law enforcement officers have "reason to believe those occupants may be armed and dangerous, the officers may reasonably order the occupants out of the vehicle 'as a means of neutralizing the potential danger' without elevating the stop to the level of an arrest." *Mosley*, 743 F.3d at 1330 (quoting *Perdue*, 8 F.3d 1463). Additionally, officers may place a suspect in handcuffs if they reasonably believe it is necessary for the protection of officer safety. *Id.* at 1329.

In *Poolaw*, the relative of a murder suspect was stopped based only on her relation to the suspect, and her car was searched to determine if a gun she possessed was the murder weapon. 565 F.3d at 736-37. There was no evidence tying her or her weapon to the crime. *Id.* This case is distinguishable from *Poolaw* because Deputy Skroch was confronted with a driver who appeared

to be heavily armed and was potentially associated with a domestic violence assault. Based on the body armor and holster worn by Defendant Samaniego-Villa, Defendant Landeros-Garcia's statement that there was a gun in back, and his own observation of rifle barrels, Deputy Skroch reasonably believed that Defendant Landeros-Garcia might also be armed and that there were weapons in the truck. *Terry* allows a protective pat-down search for weapons. *Long*, 463 U.S. at 1047-49. Neither Defendant Landeros-Garcia nor Defendant Meza-Samaniego were handcuffed, and Deputy Skroch removed the handcuffs from Defendant Samaniego-Villa after patting him down. Under these circumstances, the Court concludes that it was reasonable for Deputy Skroch to remove Defendants from the vehicle, place Defendant Samaniego-Villa in handcuffs, and search Defendants for weapons before he properly requested and examined Defendants' identification.

In response to Deputy Skroch's request for Defendants' identification, Deputy Skroch obtained Defendant Landeros-Garcia's driver's license and he and Deputy Stoffel learned that Defendant Samaniego-Villa was unlicensed and, because he provided Deputy Skroch with a Mexican voter ID, that he was not a United States citizen. Additionally, when Deputy Stoffel removed Defendant Meza-Samaniego from the car, he observed a pile of firearms that presented a potential safety risk. Officers are permitted to search a vehicle for weapons when they reasonably believe that a suspect may gain control of those weapons. *Long*, 463 U.S. at 1047-49. Such a search may even extend to a locked glovebox when the suspect is no longer in the vehicle. *United States v. Palmer*, 360 F.3d 1243, 1248 (10th Cir. 2004). The Court concludes that Deputy Stoffel acted reasonably in securing the firearms while Deputy Skroch questioned Defendants and that his actions in doing so did not exceed the scope of the initial stop.

However, after Deputy Skroch concluded that Defendants were not involved in the domestic violence incident he continued to question Defendants about the weapons in the truck. This questioning did expand the scope of the initial stop, and so must be supported by reasonable suspicion. Apart from his prior knowledge of the domestic violence incident, Deputy Skroch testified that he suspected Defendants might be involved in criminal activity when he first approached the truck because the truck had failed to stop when Deputy Skroch activated his emergency lights, the driver failed to turn off the vehicle's engine when so instructed, the neighborhood was a high-crime area and the stop was late at night, the driver was wearing body armor, a holster, and a magazine, and the truck contained two flash-bang explosive devices, a figure of Santa Muerte, and significant amounts of cash scattered across the dashboard. Deputy Skroch testified that based on his training and experience, the failure to stop was not consistent with an innocent motorist and the weapons, cash, and figurine were signs of drug trafficking. Conduct need not be unlawful to support reasonable suspicion. *Winder*, 557 F.3d at 1134.

Further, upon his initial questioning of Defendants and within the permissible scope of the traffic stop, Deputy Skroch and Deputy Stoffel learned that the registered owner of the truck was not present, Defendant Samaniego-Villa had been driving the truck without a license, there were numerous guns in the truck, and neither Defendant Samaniego-Villa nor Defendant Meza-Samaniego were United States citizens. When Deputy Stoffel secured the firearms, he observed that one of the guns was capable of being fully automatic and was likely not carried legally. Based on the totality of circumstances, the Court finds that the extended detention of Defendants to question them about weapons and narcotics was supported by reasonable suspicion and did not rise to the level of a de facto arrest. Because Defendants were not seized in violation of the Fourth Amendment, the United States need not prove that the evidence sought to be suppressed

is not fruit of the poisonous tree. *See Mosley*, 743 F.3d at 1323. Defendants lack standing to directly challenge the search of the truck, and accordingly the Court concludes that suppression of evidence is not required under the Fourth Amendment.

### C.      Miranda Violation

Although Defendants were not unlawfully seized under the Fourth Amendment, Defendant Samaniego-Villa contends that his Fifth Amendment rights were violated when he was questioned while handcuffed and without receiving *Miranda* warnings. Defendant Samaniego-Villa asserts that Deputy Skroch and Deputy Marquez asked him about the presence of narcotics in the truck and for which items Defendant Samaniego-Villa was responsible, and that the deputies knew the answers to these questions were likely to be incriminating.

The United States concedes that Defendant Samaniego-Villa was in custody for the purpose of the Fifth Amendment and that he was not given *Miranda* warnings. However, "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights." *United States v. Patane*, 542 U.S. 630, 641 (2004). "[P]hysical evidence obtained as a fruit of a defendant's voluntary, i.e. uncoerced, statement to a police officer is admissible at trial 'regardless of whether the officer gave the defendant *Miranda* warnings.'" *United States v. Lara-Garcia*, 478 F.3d 1231, 1235 (10th Cir. 2007) (quoting *United States v. Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006)). Defendant Samaniego-Villa does not contend that the seizure of the firearms was the result of any involuntary statement. Accordingly, the Court concludes that suppression is not required.

IT IS THEREFORE ORDERED that the MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE BY DEFENDANT JESUS SAMANIEGO-VILLA (Doc. 44) and DEFENDANT DANIEL LANDEROS'S MOTION TO SUPRESS EVIDENCE DERIVED AS A RESULT OF AN INVALID SEARCH AND SEIZURE AND MEMORANDUM IN SUPPORT THEREOF (Doc. 45) are DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE